IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FIRSTMERIT BANK, N.A. ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 04-1497 |
| ) | |
| VISION FINANCIAL GROUP, INC. ) | |
| Defendant. ) | |

MEMORANDUM ORDER

CONTI, District Judge

*Introduction*

Pending before the court are cross-motions for summary judgment relating to a claim for rescission of an assignment of an equipment lease. The equipment lease was assigned by Vision Financial Group Inc. ("Vision Financial" or "defendant") to FirstMerit Bank, N.A. ("FirstMerit" or "plaintiff"). Plaintiff contends there are no genuine issues of material fact in dispute and that the undisputed facts of record warrant the grant of summary judgment in its favor due to a mutual mistake of fact – the equipment which was the subject of the lease did not exist – permitting rescission of the assignment of the lease. Defendant asserts to the contrary that summary judgment should be granted in its favor because plaintiff assumed the risk of the mutual mistake. The court concludes that there are no genuine issues of material fact in dispute and that based upon the undisputed facts of record, after drawing all reasonable inferences in plaintiff's favor, plaintiff assumed the risk of the mistake of fact. Summary judgment, therefore, will be granted in favor of defendant.

*Factual and Procedural Background*

FirstMerit is a national bank with principal offices in Akron, Ohio and maintains an equipment leasing and financing division. Defendant's Joint Statement of Material Facts ("D.J.S.") ¶ 1. Vision Financial is a general equipment leasing and financing company headquartered in Pittsburgh, Pennsylvania. Id. ¶ 4. Nanomat, Inc. ("Nanomat") operated a nanotechnology business with a manufacturing facility in North Huntingdon, Pennsylvania. Plaintiff's Joint Statement of Material Facts ("P.J.S.") ¶ 1. Nanomat was a named defendant in this case, but due to its filing for bankruptcy protection, the court on April 27, 2005 terminated the case against Nanomat. (Doc. No. 12).

In 2000, Vision Financial began providing lease financing to enable Nanomat to acquire several pieces of equipment. P.J.S. ¶¶ 2, 5. Ultimately, during approximately a three-year period Vision Financial provided financing for between 20 and 40 leases for Nanomat. The amount of the financing provided by Vision Financial to Nanomat aggregated between $4,000,000 to $5,000,000. Id. ¶ 6. As of July 9, 2001, Vision Financial had provided permanent financing of $136,578 to Nanomat and assigned to other lenders two Nanomat leases aggregating in value $767,622. Id. ¶ 10.

Provident Bank ("Provident") provided Vision Financial a $15,000,000 line of credit to finance leases on a permanent basis, as well as a $5,000,000 warehouse line of credit to finance leases on a temporary basis. Id. ¶ 9. Under the arrangement between Vision Financial and Provident, Provident permitted Vision Financial to extend financing under the $15,000,000 line of credit in an amount not to exceed $250,000 for a single customer and would permit financing beyond that level under the warehouse line of credit if the financing was temporary and Vision

Financial had obtained a letter of approval from another financial institution to take out the financing and to finance the lease on a permanent basis. Id.

In November 2002, Nanomat requested financing from Vision Financial for a rotary tube reactor system (the "Furnace"). Nanomat represented it purchased the Furnace in March 2002 from Harper International ("Harper") for approximately $950,000. Id. ¶ 7. Nanomat wanted to obtain lease financing for the Furnace by the end of 2002, and Vision Financial's sales representative wanted to accommodate Nanomat's request. Id. ¶ 7. At that time less than 100 of the 9,000 leases entered into by Vision Financial since 1991 had exceeded $250,000. Id. ¶ 8.

One of FirstMerit's vice presidents in its equipment leasing and financing division had mailed written solicitations to Vision Financial and similar companies during each quarter beginning in 1998. D.J.S. ¶¶ 2, 5. The solicitations sent to Vision Financial described FirstMerit's desire to purchase equipment leases. Id. ¶ 5. Because the lease financing for the Furnace would have exceeded Vision Financial's credit limit from Provident for permanent financing for a single customer, Vision Financial contacted FirstMerit in late November 2002 concerning Vision Financial's temporary financing of a lease for the Furnace and subsequently assigning the lease to FirstMerit. P.J.S. ¶ 11.

Vision Financial provided FirstMerit information submitted by Nanomat to Vision Financial, including financial records, updated credit applications, a description of the Furnace, an invoice for the purchase of the Furnace from Harper, copies of checks from Nanomat to Harper for the purchase of the Furnace, a copy of an acceptance certificate, personal and company tax returns, credit bureau reports, Dun & Bradstreet reports, and bank references. D.J.S. ¶ 10; P.J.S. ¶¶ 13-17. During the due diligence process, Vision Financial acted as the

liaison between FirstMerit and Nanomat. D.J.S. ¶ 13. Vision Financial discovered a blanket lien filed by Mellon Bank ("Mellon") for which it obtained a subordination from Mellon. P.J.S. ¶ 18. An asset manager of Vision Financial contacted a Harper salesperson about the Furnace, but did not reveal that Nanomat claimed to have already purchased the Furnace. Id. ¶ 19. FirstMerit extensively reviewed Nanomat's credit worthiness and researched the Furnace on Harper's website. D.J.S. ¶ 12. During December 2002, FirstMerit examined the Nanomat credit information and other documentation provided to FirstMerit by Vision Financial. P.J.S. ¶ 26.

In December 2002, FirstMerit requested that Vision Financial schedule a meeting with Nanomat. Id. Several representatives of FirstMerit and Vision Financial attended the meeting at Nanomat's manufacturing facility. After the meeting Srinkath Raghunathan ("Raghunathan"), one of Nanomat's principals, hosted a tour of the Nanomat facility and pointed out a piece of equipment representing that it was the Furnace. Id. ¶¶ 22-23.

On December 23, 2002, FirstMerit internally approved the lease financing of the Furnace. D.J.S. ¶ 17; P.J.S. ¶ 26. On December 24, 2002, Vision Financial reported that approval to Provident. P.J.S. ¶ 26. Vision Financial and Nanomat executed a lease for the Furnace dated December 23, 2002 and a sale and leaseback agreement dated December 24, 2002, pursuant to which Vision Financial agreed to purchase the Furnace from Nanomat for $954,238.84 and lease it back to Nanomat for monthly installments of $19,800 for 60 months (the "sale leaseback transaction"). Id. ¶ 27. Sometime before January 1, 2003, Provident funded the sale leaseback transaction. Id. ¶ 32. Nanomat provided a bill of sale and certification of the Furnace's delivery, installation, testing, inspection, and acceptance in exchange for a check from Vision Financial in the amount of $954,238.84. Id. ¶¶ 28-29.

On December 27, 2002, FirstMerit sent a letter to Vision Financial committing to the takeout lease financing subject to conditions, including obtaining a subordination agreement from Mellon.  Id. ¶ 31.  On January 27, 2003, Vision Financial assigned the lease of the Furnace to FirstMerit for $1,013,793.23, which included the payment of a fee in the amount of $56,174.79 to Vision Financial.  Id. ¶ 34.  Nanomat began making the $19,800 monthly lease payment to FirstMerit.  Id. ¶ 43.

The assignment of the lease from Vision Financial, as assignor, to FirstMerit, as assignee, was made pursuant to an Assignment and Assumption Agreement dated January 27, 2003.  Ex. A to Def.'s App. of Evidentiary Materials, Doc. No. 25-3; Ex. 24 to Pl.'s App. of Exhibits, Doc. 24-9 (the "Agreement").  Relevant terms of the Agreement include:

> 4. ADDITIONAL CONDITIONS PRECEDENT.  Assignee's obligations hereunder are subject to satisfaction by Assignor of the following conditions precedent on or before the Closing Date:
>
>> a. Assignor shall have delivered to Assignee:
>> . . . .
>>> (v) all acceptance certificates, purchase orders, and all other documents related to the Equipment, the Lease, and the Schedule; and
>> . . . .
>
> 5. REPRESENTATIONS AND WARRANTIES.
>
>> (a) Representations and Warranties of Assignor: Assignor, in order to induce Assignee to enter into this "Lease Agreement", hereby represents and warrants to Assignee that:
>> . . . .
>>> (iii) The Lease is genuine and is in full force and effect and Assignor is not in default under the Lease and Assignor has no knowledge of any default by Lessee under the Lease, and Assignor has no knowledge of any facts impairing the value or

validity of the Lease, any rights created thereby, the Equipment or this Agreement.

. . . .

(xi) Except as set forth in this Section 5, Assignor has not heretofore made, nor does it make by this Agreement or any document entered into in connection herewith, any representations or warranties, and assumes no liability or responsibilities with respect to the due execution by the Lessee, legality, validity, sufficiency, enforceability or collectibility under any of the Lease documents or any document related thereto. <u>With respect to the Equipment</u>,[1] ASSIGNOR MAKES NOT REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, <u>AS TO ANY MATTER WHATSOEVER CONCERNING THE EQUIPMENT</u>, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF TITLE, SELECTION, QUALITY, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR FREEDOM FROM CLAIMS OF COPYRIGHT OR PATENT INFRINGEMENT OR THE LIKE.

. . . .

7. MISCELLANEOUS.

. . . .

(c) This agreement shall be governed by and construed in accordance with the laws of the State of Ohio, including all matters of construction, validity, performance and enforcement.

. . . .

(g) Notwithstanding any other conditions contained herein, it is hereby agreed that the representations, warranties, indemnities and assurances of each party hereto shall survive the expiration or termination of this Agreement and inure to the benefit of and be binding upon each of the parties and their respective successors and assigns.

---

[1]The Equipment referred to is the Furnace.

Agreement at 1-3, 5 (emphasis added).

Sometime before April 7, 2003, an employee at Mellon notified Vision Financial of concerns about Nanomat's finances and suspicions that Nanomat may be involved in fraud. P.J.S. ¶ 35. As a result, Vision Financial began auditing Nanomat. Id. ¶ 36. Vision Financial obtained updated credit bureau reports and bank references and a new Dunn & Bradstreet report. Id. Nanomat's accountant failed to return telephone calls from Vision Financial and Raghunathan never responded to Vision Financial's request for verification of Nanomat's 2000-2001 tax returns. Id. ¶ 39. In the summer of 2003, Vision Financial informed Nanomat that Vision Financial would no longer do business with Nanomat until Nanomat verified its tax returns. Id. Vision Financial did not report its suspicions or concerns about Nanomat to any assignees to whom Vision Financial had assigned leases, including FirstMerit. Id. ¶ 40.

FirstMerit approved two loans to Nanomat in 2003 aggregating $3,000,000 – $1,000,000 in April 2003 and $2,000,000 in August 2003. Id. ¶¶ 41-42. In 2004, after discovering that Nanomat's principals were under criminal investigation, FirstMerit contacted Harper and learned that Harper had not sold the Furnace to Nanomat. Id. ¶ 45. FirstMerit also learned that Nanomat fabricated the checks it purported to have made payable to Harper and the invoice from Harper. Id. FirstMerit sent a letter to Vision Financial on August 26, 2004, informing Vision Financial that the Furnace was never sold to Nanomat, and requested rescission of the assignment of the Furnace lease due to a mutual mistake. Id. ¶ 50.

On September 3, 2004, FirstMerit filed the instant complaint against Vision Financial asserting that the Agreement should be rescinded due to a mutual mistake. Id. ¶ 51. On December 24, 2004, in response to a petition by FirstMerit, this court appointed a provisional

officer for Nanomat. Id. ¶ 48. In March 2005, Nanomat filed for bankruptcy protection and its principals were shortly thereafter indicted by the United States Attorney. Id. ¶ 49.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957), cert.denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*") (emphasis added).

*Discussion*

Plaintiff, FirstMerit, seeks the grant of summary judgment in its favor for rescission of the lease assignment based upon the doctrine of mutual mistake. Defendant, Vision Financial, argues to the contrary that summary judgment should be granted in its favor because the risk of mutual mistake was assumed by plaintiff. The parties agree that pursuant to the terms of the Agreement the law of Ohio governs this dispute[2] and that a mutual mistake of fact occurred as a result of Nanomat's fraud.[3]

**I.  Mutual Mistake Doctrine – General**

Ohio courts recognize the doctrine of mutual mistake as described in sections 152 and 154 of the Restatement (Second) of Contracts. See Reilley v. Richards, 632 N.E.2d 507, 508 (Ohio 1994) ("This court recognizes the doctrine of mutual mistake as a ground for the rescission of a contract under certain circumstances."). Section 152 of the Restatement (Second) of Contracts provides in pertinent part:

> (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

---

[2]Section 7(c) of the Agreement provides that the contract "shall be governed by and construed in accordance with the laws of the State of Ohio. . . ." "A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state." Kruzits v. Okuma Mach. Tool, Inc, 40 F.3d 52, 55 (3d Cir. 1994) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941)). Since "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," Ohio law will apply to the instant matter. Id. (citing Smith v. Commonwealth Nat. Bank, 557 A.2d 775, 777 (Pa. Super. Ct. 1989)).

[3]Both parties agree that they were unaware of Nanomat's misrepresentations concerning the Furnace and that they mistakenly believed that Nanomat purchased the Furnace and stored it at its facility in North Huntingdon, Pennsylvania.

RESTATEMENT (SECOND) CONTRACTS § 152(1).  Section 154 of the Restatement (Second) of Contracts provides:

> A party bears the risk of a mistake when
> (a) the risk is allocated to him by agreement of the parties, or
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

RESTATEMENT (SECOND) CONTRACTS § 154.  "The party alleging mutual mistake has the burden of proving its existence by clear and convincing evidence."  General Tile, Inc. v. Mehlfeldt, 691 N.E.2d 1132, 1136 (Ohio Ct. App. 1997).

## II.    Applicability of Section 152 of the Restatement (Second) of Contracts

Defendant argues that the mistake in issue here is not necessarily a basic assumption which had a material effect on the agreed exchange of performances.  See RESTATEMENT (SECOND) OF CONTRACTS § 152(1).  This court disagrees.

### A. Basic Assumption of the Agreement

Vision Financial entered into the sale leaseback transaction with Nanomat, intending to assign the lease of the Furnace to FirstMerit or another suitable assignee.  It is a basic assumption of a lease that the item being leased actually exists.  The mutual mistake alleged by plaintiff is that neither party knew that Nanomat did not own the Furnace which was the subject of the lease.  In other words, neither party knew that the Furnace did not exist.  At the time of the sale lease back transaction FirstMerit had not yet entered into an agreement to assume the lease.  Basic underpinnings of the Agreement entered into by FirstMerit and

Vision Financial were that the subject of the lease – the Furnace – was owned by Nanomat, sold by Nanomat to Vision Financial and leased back to Nanomat by Vision Financial. Accordingly, the existence of the Furnace is a basic assumption of the Agreement in issue, and the mistake regarding Nanomat's purchase and ownership of the Furnace can be attributed to both parties. The court concludes, after drawing all reasonable inferences in favor of plaintiff and reviewing the material undisputed facts of record, that the existence of the Furnace is a basic assumption of the Agreement. P.J.S. ¶ 34.

### B. *Material Effect of the Mistake*

For the doctrine of mutual mistake to apply, the mistake must have a material effect on the agreed exchange of performances. RESTATEMENT (SECOND) OF CONTRACTS § 152. According to section 152 it is not enough merely to show that the parties would not have made the contract had the mistaken fact been otherwise. Id. cmt. c. A showing of material effect may be made when the parties mistake the value of the property transferred in the bargain due to the actions of a third party. See Lincoln Nat'l Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp., 9 F. Supp.2d 994 (N.D. Ind. 1998). In Lincoln National, the inaccurate and inflated value of securities reported by a third party sufficiently demonstrated a material effect on the agreed exchange of performances in the contract to purchase those securities. Id. at 1005. Here, the Furnace had no value because the equipment never existed. The mistake at issue was made by reason of the misrepresentations of Nanomat. The mistake was not caused not by the unilateral mistake of one party or by a simple mistake about the market conditions. See RESTATEMENT (SECOND) OF CONTRACTS § 152 cmt. c. The undisputed evidence of record can support only one conclusion – that assignment of a

11

lease of nonexistent equipment for which the assignee – FirstMerit – is unable to recoup the $1,013,793.23 paid for the transfer of the lease constituted a material effect on the agreed exchange of performances. P.J.S. ¶ 34.

### III. Applicability of Section 154 – Risk of Mutual Mistake

Based upon the undisputed evidence of record and after drawing all reasonable inferences in favor of the nonmoving party, the court found above that there was a mutual mistake and the mutual mistake was a basic assumption of the contract that had a material effect on the agreed exchange of performances. For defendant – Vision Financial – in light of those findings to defeat the grant of summary judgment in favor of FirstMerit and for summary judgment to be granted in defendant's favor, defendant must show that plaintiff bears the risk of the mistake. RESTATEMENT (SECOND) OF CONTRACTS §§ 152(1), 154. One scenario in which a party might bear the risk of the mistake occurs when the parties have agreed to allocate the risk within the terms of the contract. Id. at 154(a). The performance of a contract may be enforced even where a mutual mistake has occurred if the parties allocated the risk in their agreement. Id. § 154, cmt. b.

Here, the parties included language in the Assignment that clearly allocated the risk of mistake regarding the existence of the Furnace to plaintiff. See RESTATEMENT (SECOND) OF CONTRACTS § 154. The Agreement provides in pertinent part:

> Except as set forth in this Section 5, [Vision Financial] has not heretofore made, nor does it make by this Agreement or any document entered into in connection herewith, any representations or warranties, and assumes no liability or responsibilities with respect to the due execution by [Nanomat], legality, validity, sufficiency, enforceability or collectibility under any of the Lease documents or

> any document related thereto.  With respect to the [Furnace], [VISION FINANCIAL]  MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER CONCERNING THE [FURNACE], INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF TITLE,[4] SELECTION, QUALITY, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR FREEDOM FROM CLAIMS OF COPYRIGHT OR PATENT INFRINGEMENT OR THE LIKE.

Pl.'s Ex. 24,  Agreement § 5(a)(xi) at 3-4 (capitalization in original, emphasis added).  The parties' intent to allocate the risk of "ANY MATTER WHATSOEVER CONCERNING THE [FURNACE]" to plaintiff is clearly provided in the language of the Agreement.

In Corestates Bank, N.A. v. Signet Bank, 1996 U.S. Dist. LEXIS 12673, at *23 (E.D.Pa. Aug. 27, 1996), the district court found effective exculpatory language similar to that present in the Agreement.  In Corestates Bank, a dispute arose between two banks that had negotiated an assignment of a loan to a third party for the purchase of equipment, which would constitute collateral.  Id. at *3-4.  The parties assumed that the third party would lease the purchased equipment to a fourth company, which was purportedly engaged in a secret research project.  Id. at *4.  Eventually the banks discovered that the research project did not exist, nor did the equipment that served as collateral for the transaction.  Id. at *10.  The district court found that the buyer and seller allocated all risks to the buyer, including the risk that the equipment "may be worthless or even nonexistent."  Id. at *23-24.  The court identified a provision in the contract wherein the buyer agreed that: "it has not relied upon any investigation or analysis conducted by, [seller] or any agent of [seller], express or

---

[4]   *Warranty of Title.*  In a sale of goods an implied promise exists that the seller owns the items offered for sale. . . .  U.C.C. § 2-312 [codified in OHIO REV. CODE ANN. § 1302.25 (2006)]."  BLACK'S LAW DICTIONARY 1620 (8th ed. 2004).

13

implied, concerning the **financial condition of** [third party] or [fourth party] or **the Collateral**[.]" Id. at *15-16, *23-24 (emphasis in original). The court read the exculpatory language to allocate the risk that the equipment did not exist. The court found the buyer accepted the risks of "the value of the Financed Equipment, which necessarily depended on its existence." Id. at *16.

The language in the Agreement encompasses the risk that the Furnace did not exist because the language "ANY MATTER WHATSOEVER CONCERNING THE [FURNACE], INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF TITLE, SELECTION, QUALITY, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE" necessarily would include the existence of the Furnace as a matter concerning the Furnace. Pl.'s Ex. 24, Agreement at 4. It is noteworthy that the phrase "[e]xcept as set forth in this Section 5" does not modify the sentence relating to the Furnace. The parties, therefore, agreed without exception that Vision Financial did not make any representations or warranties about the Furnace.

FirstMerit contends that the risk allocation language in section 5 of the Agreement should be ignored by the court, citing Shore Builders, Inc. v. Dogwood, Inc., 616 F. Supp. 1004, 1020-21 (D. Del. 1985), for the proposition that broad, exculpatory provisions do not protect parties from liability when there is a mutual mistake with respect to an unforeseen risk. In Shore Builders, parties to a partnership sale assumed that the partnership's sole asset of undeveloped land did not comprise wetlands. Id. at 1006. After the transaction, the parties discovered that the land was subject to wetlands regulation that significantly affected the development plans. Id. at 1009-10. The court held that the broad and nonspecific

language, in which the purchaser waived the right to pursue the seller for liability, would not be considered effective. Id. at 1021. FirstMerit's reliance on Shore Builders is misplaced. In Shore Builders the court explicitly noted the "lack of sophistication among the parties" and identified the contract used as "a particularly inapt instrument for conveying undeveloped property" because it "was designed for the sale of single family residential dwellings"rather than large tracts of undeveloped land. Id. at 1020-21. In the instant matter, there can be no inequity because, unlike the situation in Shore Builders, both parties are sophisticated lenders who routinely finance and assign equipment lease agreements. In addition, the Agreement was specifically designed for this kind of transaction.

Moreover, in J.A. Industries, Inc. v. All American Plastics, Inc., 726 N.E. 2d 1066, 1072 (Ohio Ct. App. 1999), the court declined to apply the doctrine of mutual mistake because the buyer did not take reasonable steps to ensure that the purchased equipment would meet its manufacturing needs. The court applied section 154(b) of the Restatement (Second) Contracts, noting that the buyer relied on the seller's silence and alleged misrepresentations about the equipment without confirming their validity. Id. Here, neither FirstMerit nor Vision Financial verified the existence of the Furnace and each party agrees that there was a mutual mistake concerning the existence of the Furnace. In section 5(a)(iii) of the Agreement Vision Financial represented that it had "no knowledge of any facts impairing the value or validity of the Lease, any rights created thereby, the [Furance] or this Agreement." Pl.'s Ex. 24, Agreement § 5(a)(ii) at 3. FirstMerit does not contest that representation. By accepting that representation, FirstMerit also was assuming the risk that there may be – as there were – facts which impaired the value or validity of the Furnace.

15

Based upon the express provisions of the Agreement, this court finds that a verdict in favor of plaintiff could not be rendered by a fact-finder because plaintiff in the Agreement accepted the allocation of risk to itself of the mutual mistake in issue.

### *Conclusion*

**AND NOW**, this 28th day of September 2006, upon consideration of the evidence of record and the parties' arguments and supporting documents, **IT IS ORDERED** that the motion for summary judgment filed by defendant (Doc. No. 25) is **GRANTED** and plaintiff's motion for summary judgment (Doc. No. 24) shall be **DENIED**.

The clerk shall mark this case closed.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc:     counsel of record